## Sarah Ann Hart

*v.*

## Levi E. Hart and Carrie Hart.

[Filed January 13th, 1899.]

1. An agreement giving a stepson the entire management of his stepmother's estate, she to receive the profits and to make a will appointing him executor and make his wife sole legatee, to take effect after the decease of her son, in consideration of the stepson's promise to take care of herself and her imbecile son, who has an expectancy of eleven years, is supported by a sufficient consideration.

2. When she, being over eighty years of age, without counsel, and living with her stepson under the above agreement, afterwards transferred her entire estate to him—*Held*, that the transfer was without consideration, and voidable for undue influence.

*Messrs. Coddington & Swackhamer* and *Mr. Charles A. Reed*, for the complainant.

*Mr. Abraham V. Schenck,* for the defendants.

Reed, V. C.

Sarah Ann Hart, over eighty years of age, was in the beginning of the year 1896 living in a house of her own at Scotch Plains, in company with Manning Parse, a feeble-minded son, by a former husband. The property where she lived was worth from twelve hundred to fifteen hundred dollars. She also owned a mortgage of $3,500 and another mortgage of $1,000, and a wood-lot worth perhaps $250. She thought the income from her property was insufficient to support herself and son, and had conceived the notion of giving her property to some one who would keep her and her son during his and her life. On February 7th, 1897, she wrote to her stepson, Levi E. Hart, to come and see her on business. He went. He says that she wanted to break up housekeeping, and said that her income was

insufficient to support herself and Manning (her imbecile son), and she wanted to know whether he would support her and take the property.   Mr. Hart afterwards took his wife to see Mrs. Sarah Ann Hart, who told the latter that they would take her and Manning only on the terms, that after Manning's death she would give them her property.

On or about February 22d, Sarah Ann Hart came to her step-son's, and soon afterwards Mr. Marsh was employed to draw an agreement and will.   This is the agreement:

"This agreement made this twenty-seventh day of February, one thousand eight hundred and ninety-seven, by and between Sarah A. Hart of Scotch Plains, Union county, New Jersey, of the first part, and Levi E. Hart of Westfield, Union county, New Jersey, of the second part, witnesseth:

"Said party of the second part, for and in consideration of the sum of one dollar and the covenants and agreements hereinafter mentioned, does hereby agree to and with said Sarah A. Hart to take good care of and support her and her imbecile son, Manning Parse, during their natural lives, and also to have charge and look after all of her estate both real and personal wheresoever situate.

"Said party of the first part, Sarah A. Hart, in consideration of the above agreement, I do hereby make, constitute and appoint, and by these presents do make, constitute and appoint, said Levi E. Hart my true and lawful attorney for and in my name, place and stead, to look after and take care of and dispose of any or all my estate both real and personal of whatsoever kind, to execute good and sufficient deeds for same, and out of the income of my estate to pay to me such portions as I may desire for my own use, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes as I might or could do if personally persent, hereby ratify and confirm all that my said attorney shall lawfully do or cause to be done by virtue hereof.

"I hereby agree, as part of the consideration of this agreement, to make my last will and testament bearing even date herewith, appointing said Levi E. Hart executor of my said will, and to devise and bequeath to my niece, Carrie Hart, all my estate both real and personal, after the decease of myself and son, Manning Parse.

"Witness our hands and seals the day and year first above written.

"Signed, sealed and delivered in presence

"MILDRED P. MARSH,          SARAH A. HART,
"JOHN M. C. MARSH.          LEVI E. HART."

Hart *v*. Hart.

At the same time Mrs. Sarah Ann Hart made a will leaving all her property to Levi E. Hart, her executor, for the support and maintenance of Manning Parse during his natural life, and, after the death of Manning, leaving the balance of her estate to Carrie Hart, the wife of Levi E. Hart, and in case of the death of Carrie, before the death of Manning, then to Levi E. Hart.

On March 3d, 1897, Manning Parse was brought to Levi and Carrie Hart's. He lived there until his death, which occurred on June 30th of the same year.

On August 9th following, Sarah Ann Hart conveyed to Levi E. Hart all her real estate and assigned to him her mortgages. On November 7th following, Sarah Ann Hart left the home of Levi and Carrie Hart, and went to her brother's, William Smock. She never returned to her stepson's, but afterwards filed this bill to set aside the conveyances and assignments of the mortgages, upon the ground that they were executed by her, being unduly influenced thereto by Levi E. and Carrie Hart.

The original agreement of February 27th, 1897, is not attacked by the bill filed in this case. The attack is made solely against the conveyances of the real estate and the assignment of the mortgages.

The testimony, however, dealt with the entire transactions between Sarah Ann Hart and Levi E. and Carrie Hart, from the time that Sarah Ann Hart first came to the house of the latter until the execution of the conveyances and assignments.

Nor does there seem to be any substantial ground for an attack upon that agreement, for although Sarah Ann Hart was not of robust mentality, she possessed ample capacity to make a contract, if such agreement was not improvident. This agreement was in no way improvident. Levi E. Hart was to keep her and her imbecile son during their lives. The son had a life expectancy of over eleven years. His habits were such that his care was a great burden to his keepers, and I am quite sure that very few responsible persons would have taken him in their families upon the same terms. That he happened to die shortly after the agreement was executed, is no reason for disregarding the validity of the agreement. Each party took the chances of

35

his early or late death.    Nor is there a particle of evidence of
coercion or improper influence on the part of the stepson, for it
is clear that Mrs. Sarah Ann Hart solicited the interviews which
led to the agreement.    But apart from any consideration of the
testimony in respect to the validity of this agreement, it is suffi-
cient to say that the complainant has not attacked it, and the
agreement therefore must be regarded as entirely valid.

But I am of the opinion that the deeds and assignments of
August 9th should not be permitted to stand.    They were clearly
improvident acts of an old lady of easily influenced mental dis-
position, who lived in the family of the grantee.    The proof of
the fairness of the transaction is thrown upon him.    The im-
providence of these transfers is obvious.    She had already an
agreement with Levi E. Hart that he would support her during
her life.    This agreement left her the free use of the income of
her property during her life.    The agreement provided that Levi
E. Hart was to support her and her son and to pay to her such
part of the income as she might desire.    What the Harts got
under the agreement was a promise to execute a will in their
favor, which promise, if supported by a good consideration, a
court of equity will enforce.    *Duvale* v. *Duvale, 9 Dick. Ch.
Rep. 581 ; S. C. on appeal, 10 Dick. Ch. Rep. 375.*

The transfers of the real and personal property, therefore, were
purely voluntary.    The unsigned paper prepared in November,
1897, was intended to give her nothing that she did not already
have under the February agreement.    Her position, after the
execution of the instrument of August 9th was, that she, by the
operation of those conveyances, was stripped at once of all her
property, both *corpus* and income.

The account given by Mr. Hart, to the effect that Sarah Ann
Hart was induced to make the transfer to prevent Mr. Stanbery
from collecting from her estate, after her death, anything for
his services in transacting her business, is probably true.    But it
is not the whole truth.    I have not the least doubt he told her
of the demand of Mr. Stanbery nor do I doubt that he suggested
this transfer as a foil to Mr. Stanbery's proposed claim, and that
these suggestions led to her consenting to the transfers.    They

were made without consultation with any disinterested person, without consideration, in favor of those in whose house and in whose care she lived. I am of the opinion that there must be a decree annulling the conveyances and assignments.

The relief in regard to the reconveyance of the lands and the re-assignment of the $1,000 mortgage is simple. But in respect to the $3,500 mortgage, which has been paid to Levi E. Hart, the proper relief is not so clear. Most of the proceeds of this mortgage went to the payment of the Robinson mortgage, which was an encumbrance upon the property of Mrs. Carrie Hart. If Mr. Brown, the brother-in-law of Mr. Hart, to whom a new mortgage has been made upon the property of Carrie Hart, was a party to this suit, the facts, as they now appear, are such that the amount paid by Levi E. Hart in liquidating the Robinson mortgage, could be impressed upon the mortgaged lands as a lien in favor of Sarah Ann Hart superior to the lien of Mr. Brown ; but as Mr. Brown is not a party, no such decree can be made.

I will advise a decree, therefore, that in regard to those moneys, Levi E. Hart shall account or furnish adequate real estate mortgage security to Mrs. Sarah Ann Hart, for the payment of this money in the place of the mortgage paid off.